ANGELA KAYE BELEW, et al.            ]
                                      ]
v.                                    ]        No. 1-01-0139
                                      ]        Judge Higgins
GILES COUNTY ADULT-ORIENTED          ]
ESTABLISHMENT BOARD, et al.          ]

## M E M O R A N D U M

This action went to trial without the intervention of a jury
on July 16, 2002, on the claims of the plaintiffs, Angela Kaye
Belew and Kathryn Theresa Piper, against the defendants, the Giles
County Adult-Oriented Establishment Board; Eddie Bass, in his
official capacity as Sheriff of Giles County; T. Michael Bottoms,
in his official capacity as District Attorney General for the 22nd
Judicial District of the State of Tennessee; and Paul G. Summers,
in his official capacity as Attorney General and Reporter for the
State of Tennessee. The plaintiffs filed this action on December
27, 2001, alleging that the Adult-Oriented Establishment
Registration Act of 1998, Tennessee Code Annotated § 7-51-1101 et
seq. (2001), violates their rights under the First and Fourteenth
Amendments. The plaintiffs seek declaratory judgment determining
the constitutionality of the Registration Act and injunctive relief
prohibiting the enforcement of the Act.

The Court has jurisdiction over this matter pursuant to 28
U.S.C. §§ 1331 and 1343(a)(3) and (4).

The plaintiffs, Angela Kaye Belew, a dancer at a nightclub/tavern known as Club Utopia, and Kathryn Theresa Piper, a bartender/waitress at Club Utopia, present a facial challenge to the constitutional validity of the Registration Act. The Registration Act requires, inter alia, that adult-oriented establishments[1] must be licensed in order to operate as such and that all employees and entertainers working in such establishments are to have a valid permit to work there. It further regulates the

---

[1]Section 7-51-1102(6) defines what constitutes an "adult-oriented establishment." That section states the following:

"Adult-oriented establishment" includes, but is not limited to, an adult bookstore, adult motion picture theater, adult mini-motion picture establishment, adult cabaret, escort agency, sexual encounter center, massage parlor, rap parlor, sauna, and further "adult-oriented establishment" means any premises to which the public patrons or members are invited or admitted and which are so physically arranged as to provide booths, cubicles, rooms, compartments or stalls separate from the common areas of the premises for the purpose of viewing adult-oriented motion pictures, or wherein an entertainer provides adult entertainment to a member of the public, a patron or a member, when such adult entertainment is held, conducted, operated or maintained for a profit, direct or indirect. "Adult-oriented establishment" further includes, without being limited to, any adult entertainment studio or any premises that is physically arranged and used as such, whether advertised or represented as an adult entertainment studio, rap studio, exotic dance studio, encounter studio, sensitivity studio, model studio, escort service, escort or any other term of like import[.]

2

manner in which entertainers may perform their dance routines.[2]
See Tenn. Code Ann. §§ 7-51-1104 to -1106, 7-51-1114 to -1119.

---

[2]Section 7-51-1114 provides in part:

(a) No operator, entertainer or employee of an adult-oriented establishment (either on the premises or in relation to the person's role as an operator, entertainer, or employee of an adult-oriented establishment) shall permit to be performed, offer to perform, perform, or allow patrons to perform sexual intercourse or oral or anal copulation or other contact stimulation of the genitalia.

(b) No operator, entertainer or employee of an adult-oriented establishment shall encourage or permit any person upon the premises to touch, caress or fondle the breasts, buttocks, anus or genitals of any operator, entertainer or employee.

(c) No entertainer, employee, or customer shall be permitted to have any physical contact with any other on the premises during any performance and all performances shall only occur upon a stage at least eighteen inches (18') above the immediate floor level and removed at least six feet (6') from the nearest entertainer, employee, and/or customer.

(d)(1) No employee or entertainer, while on the premises of an adult-oriented establishment, may:

    (A) Engage in sexual intercourse;
    (B) Engage in deviant sexual conduct;
    (C) Appear in a state of nudity; or
    (D) Fondle such person's own genitals or those of another.

(2) For the purpose of this section, "nudity" means the showing of the human male or female genitals or pubic area with less than a fully opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple, or the showing of the covered male genitals in a discernibly turgid state.

3

Section 7-51-1120 of the Act provides that the provisions of Title 7, Chapter 51, Part 11, shall become effective in a particular county upon a two-thirds (2/3) vote of the county legislative body adopting the Act. Tenn. Code Ann. § 7-51-1120. On November 15, 1999, the Giles County Commission adopted the Registration Act for local application and pursuant to § 7-51-1103(a) of the Act, the Giles County Adult-Oriented Establishment Board was created to carry out the provisions of the Act.

The Registration Act allows existing adult-oriented establishments 120 days from the effective date of the Act within which to apply for a license or they must cease operation. Tenn. Code Ann. § 7-51-1104(e). Jim Prince, the owner and operator of Club Utopia, chose not to apply for a license during the 120-day grace period and instead restricted the content of the dance routines performed at Club Utopia in order to avoid violating any of the provisions of the Registration Act. Ms. Belew began dancing at Club Utopia in April, 2000, and Ms. Piper began working there as a bartender/waitress in August, 2001. Neither one applied for a permit.

Originally, when Club Utopia opened in September, 1999, the entertainers danced topless and wore bikini thongs, which covered their genitals and the cleft of their buttocks. After receiving a letter from the Giles County Adult-Oriented Establishment Board informing him that he needed to apply for a license in order to

4

operate his business as an adult-oriented establishment, Mr. Prince decided against applying for a license and instead elected to have his entertainers wear full bikinis, covering their entire breasts, genitals and buttocks.

On September 28, 2001, the Giles County Adult-Oriented Establishment Board voted to begin enforcement of the Registration Act. In a letter dated October 1, 2001, the Giles County Clerk, Emily Townsend, informed Mr. Prince of the board's decision and that the deadline for applying for a license in compliance with the Act was November 6, 2001. Plaintiffs' exhibit 4. Mr. Prince was concerned about being classified as an adult cabaret[3] under the Act and had his entertainers, including Ms. Belew, switch back to wearing full bikinis.[4] However, in June, 2002, he directed his

---

[3]An "adult cabaret" is defined as:

[A]n establishment which features as a principal use of its business, entertainers and/or waiters and/or bartenders who expose to public view of the patrons within such establishment, at any time, the bare female breast below a point immediately above the top of the areola, human genitals, pubic region, or buttocks, even if partially covered by opaque material or completely covered by translucent material; including swim suits, lingerie, or latex covering. "Adult cabaret" includes a commercial establishment which features entertainment of an erotic nature including exotic dancers, strippers, male or female impersonators, or similar entertainers . . . .

Tenn. Code Ann. § 1102(2).

[4]Testimony by Timothy Underwood, attorney for Giles County, revealed that the board had voluntarily stayed the enforcement of the Registration Act prior to September 28, 2001.

Case 1:01-cv-00139 Document 20 Filed 09/30/05 Page 5 of 74 PageID #: 5

entertainers to switch to wearing "pasties," or coverings, over their nipples and areolae and bikini thongs in order to compete with other clubs.

Ms. Belew asserts that she has been affected by the adoption of the Registration Act in that it has had a chilling effect on the presentation of dance routines of an expressive nature which are protected by the First Amendment. Ms. Piper asserts that she is subject to the operation of the Act in that she will be required to obtain a permit in order to continue with her present employment if enforcement of the Act as to Club Utopia is not enjoined. They both testified that if they are required to apply for permits they will not work at Club Utopia. They also assert that: (1) the Registration Act is unconstitutionally vague and/or overbroad as to what persons are subject to the permit requirements created by the Act; (2) the Act imposes a constitutionally invalid prior restraint upon the exercise of their First Amendment rights of free expression; (3) certain provisions of the Act violate the plaintiffs' right to privacy; (4) the fees for obtaining a permit are unconstitutionally excessive; and (5) the restrictions imposed by the Act upon First Amendment expression are significantly greater than necessary to further any governmental interest(s) unrelated to the suppression of free expression.

The defendants contend that the Registration Act is constitutional and assert that to the extent this Court finds any

6

clause or provision to be unconstitutional the Court should give effect to the severability clause under the Tennessee Code and make an elision so as not to invalidate the entire act. The defendants also assert that the plaintiffs lack standing to bring this action.

II.

"Where the plaintiff establishes a constitutional violation after a trial on the merits, the plaintiff will be entitled to permanent injunctive relief upon showing 1) a continuing irreparable injury if the court fails to issue the injunction, and 2) the lack of an adequate remedy at law." Kallstrom v. City of Columbus, 136 F.3d 1055, 1067 (6th Cir. 1998). Other relevant factors are whether the granting of injunctive relief will substantially harm others and whether the public interest will be served by the injunctive relief. Markva v. Haveman, 168 F. Supp.2d 695, 718 (E.D. Mich. 2001). The decision to grant a permanent injunction is within the sound discretion of the district court. Kallstrom, 136 F.3d at 1067. Such injunctive relief should be no broader than necessary to remedy the harm at issue. Id. at 1069. The Supreme Court of the United States has stated that "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" Connection Distrib., 154 F.3d at 288 (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2573, 2690, 49 L.Ed.2d 547, 565 (1976)(plurality) and citing Newsom v. Norris, 888 F.2d 371, 378 (6th Cir. 1989) for the

7

proposition that "even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.").

### III.

Sexually explicit, non-obscene performances and materials are expressions protected by the First Amendment to the United States Constitution. Young v. American Mini Theatres, Inc., 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310, 326 (1976). However, society is considered to have less interest in protecting this kind of expression than in protecting other kinds of speech. Id. Consequently, sexually explicit expression falls within the "outer perimeters of the First Amendment." Barnes v. Glen Theatre, Inc., 501 U.S. 560, 566, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504, 511 (1991); see also Richland Bookmart, Inc. v. Nichols, 137 F.3d 435, 438 (6th Cir. 1998). Accordingly, the type of expression which the Registration Act seeks to regulate is on the "outer perimeters" of expression protected by the First Amendment. Id.

The level of scrutiny that courts apply in analyzing laws regulating such expression depends on the type of regulation at issue. Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville, 274 F.3d 377, 391 (6th Cir. 2001). If the regulation is "'content based,' that is, intended to impact speech," then courts apply strict scrutiny. Id. However, if the regulation is

8

unrelated to the content of speech, courts apply an intermediate
level of scrutiny. Id.

## IV.

## A. STANDING

"The federal courts are under an independent obligation to
examine their own jurisdiction, and standing 'is perhaps the most
important of [the jurisdictional] doctrines.'" FW/PBS, Inc. v.
City of Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d
603, 621 (1990) (quoting Allen v. Wright, 468 U.S. 737, 750,
104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, 569 (1984)). The party
seeking to invoke jurisdiction must "'clearly . . . allege facts
demonstrating that he is a proper party to invoke judicial
resolution of the dispute.'" Id., 493 U.S. at 231, 110 S.Ct. at
608, 107 L.Ed.2d at 622 (quoting Warth v. Seldin, 422 U.S. 490,
518, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343, 366 (1975)). A party
asserting standing must prove:

> (1) "injury in fact," by which we mean an invasion of a
> legally protected interest that is (a) concrete and
> particularized, and (b) actual or imminent, not
> conjectural or hypothetical; (2) a causal relationship
> between the injury and the challenged conduct, by which
> we mean that the injury fairly can be traced to
> challenged action of the defendant, and has not resulted
> from the independent action of some third party not
> before the court; and (3) a likelihood that the injury
> will be redressed by a favorable decision, by which we
> mean that the prospect of obtaining relief from the
> injury as a result of a favorable ruling is not too
> speculative.

9

<u>DLS, Inc. v. City of Chattanooga</u>, 107 F.3d 403, 414 (6th Cir. 1997)

(citing <u>G & V Lounge, Inc. v. Michigan Liquor Control Comm'n</u>, 23

F.3d 1071, 1074 (6th Cir. 1994)).

> In the area of freedom of expression it is well
> established that one has standing to challenge a statute
> on the ground that it delegates overly broad licensing
> discretion to an administrative office, whether or not
> his conduct could be proscribed by a properly drawn
> statute, and whether or not he applied for a license.

<u>Freedman v. Maryland</u>, 380 U.S. 51, 56, 85 S.Ct. 734, 737,

13 L.Ed.2d 649, 653 (1965).

The plaintiffs have alleged several injuries-in-fact. They

first allege that the Registration Act is vague and/or overbroad[5]

and second that it vests unfettered discretion in the licensing

board resulting in a prior restraint of activities protected by the

First Amendment.

> [A] prior restraint constitutes a concrete and
> particularized actual injury in fact. It is well
> established that "when a licensing statute allegedly
> vests unbridled discretion in a government official over
> whether to permit or deny expressive activity, one who is
> subject to the law may challenge it facially without the
> necessity of first applying for, and being denied, a
> license." <u>City of Lakewood v. Plain Dealer Publishing
> Co.</u>, 486 U.S. 750, 755, 108 S.Ct. 2138, 2143, 100 L.Ed.2d
> 771 (1988); <u>see also</u> <u>Doran v. Salem Inn</u>, 422 U.S. 922,
> 932-33, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975)
> (holding that it was firmly established that owners of
> topless bar had standing to challenge on the basis of
> overbreadth an ordinance banning topless dancing, even
> though they had not yet been prosecuted under the law);
> <u>Shuttlesworth v. Birmingham</u>, 394 U.S. 147, 151, 89 S.Ct.
> 935, 938-39, 22 L.Ed.2d 162 (1969) ("The Constitution can

---

[5]The plaintiffs' vagueness and overbreadth claims will be
discussed fully in part V. C. <u>infra</u>.

Case 1:01-cv-00139  Document 20  Filed 09/30/05  Page 10 of 74 PageID #: 10

hardly be thought to deny to one subjected to the restraints of [a licensing law] the right to attack its constitutionality, because he has not yielded to its demands.") . . . .

G & V Lounge, 23 F.3d at 1075.

The plaintiffs also allege that the Registration Act (1) is constitutionally infirm in that it provides inadequate administrative procedures with regard to the issuance or revocation of permits, (2) fails to guarantee judicial review of a permit denial and (3) fails to allow an applicant seeking an entertainer permit to engage in protected expression while initial consideration of the application is pending or provide the applicant with a provisional or conditional permit pending administrative and judicial review of the denial of a permit application. The plaintiffs further assert that the compulsory disclosure requirements of the Act infringe upon the plaintiffs' right to privacy and the fees for obtaining a permit are excessive.

The defendants assert that the alleged harm to the plaintiffs is caused by their own inaction in not complying with the Registration Act in a timely manner or even timely challenging the validity of it.

At the time of trial, Mr. Prince was operating Club Utopia as an adult cabaret[6] under the Registration Act without a license, Ms.

---

[6]The parties dispute whether or not Club Utopia can be classified as an "adult cabaret" under the Registration Act. However, Mr. Prince testified that he had his entertainers return to wearing thongs and pasties in order to compete with the other

11

Belew was knowingly performing semi-nude dances in an unlicensed establishment without a permit, and Ms. Piper was knowingly working as a bartender/waitress in the same unlicensed establishment without a permit. Mr. Prince had previously required his dancers, such as Ms. Belew, to wear full bikinis to avoid Club Utopia from being classified as an adult cabaret under the Act based on the letter he received from the board informing him of its intention to begin enforcement of the Act and setting the deadline for applying for a license as November 6, 2001.

With regard to Ms. Piper, the Court finds that she lacks standing to contest the constitutionality of the Registration Act because the record reveals that she is only a waitress/bartender and does not engage in expressive activity, such as dancing, protected by the First Amendment. Other than engaging in general conversation with patrons, Ms. Piper is not attempting to convey any particular speech or message. There is nothing in the Act, which prohibits her in her role as a waitress/bartender from speaking to customers as she normally does. However, as is evidenced by the defendants' letter and the board's decision to begin enforcement of the Registration Act, there is a real threat that the board will shut down any business that is in noncompliance

---

clubs. Previously, he had his entertainers wear bikinis in order to avoid being classified as an adult cabaret. By having them switch back to thongs and pasties, Club Utopia appears to fall under the definition of "adult cabaret." Therefore, the Court will assume that Club Utopia may be classified as an adult cabaret.

12

with the Registration Act. Therefore, Ms. Belew has a reasonable belief that the defendants will enforce the Act against Club Utopia and herself and she will be required to apply for a permit. G & V Lounge, 23 F.3d 1075-76 ("[T]he threat to take away Plaintiff's license or permit has already chilled Plaintiff from presenting a First Amendment protected activity to the public."); see also Entertainment Concepts, Inc., III v. Maciejewski, 631 F.2d 497, 500 (7ᵗʰ Cir. 1980) (stating that even though the village board did not specifically threaten the plaintiff with prosecution, the board's conduct indicated more than a broad policy that it would enforce the laws generally:

> Plaintiff can reasonably assert that it fears enforcement of these two ordinances for specific conduct on its part. "Under such circumstances, this Court does not feel it 'necessary that (plaintiff) first expose himself to actual arrest or prosecution to be entitled to challenge a statute he claims deters the exercise of his constitutional rights.'"

Id. (citation omitted)); City of Houston v. Hill, 482 U.S. 451, 459 n.7, 107 S.Ct. 2502, 2508 n.7, 96 L.Ed.2d 398, 410 n.7 (1987) (plaintiff had standing to seek prospective relief where he had shown a "genuine threat of enforcement" of the ordinance in question).

Further, Ms. Belew has alleged that the Registration Act operates as a prior restraint on activities protected by the First Amendment. As the United States Court of Appeals for the Sixth Circuit stated in G & V Lounge, 23 F.3d 1075-76, a "prior restraint

13

constitutes a concrete and particularized actual injury in fact." The threat of the defendants initiating proceedings against Club Utopia, the plaintiffs' workplace, for noncompliance with the Act is actual and imminent. Giles County has adopted the Act, and, as the Court has explained above, Ms. Belew does not need to apply for a permit in order to challenge the constitutionality of the Act. Further, the County's alleged prior restraint is directly traceable to the Act, and it is redressable by a favorable decision for Ms. Belew. Accordingly, based on the above, the Court finds that Ms. Belew has standing to contest the constitutionality of the Registration Act. Freedman, 380 U.S. at 56, 85 S.Ct. at 737, 13 L.Ed.2d at 653; City of Lakewood, 486 U.S. at 755, 108 S.Ct. at 2143, 100 L.Ed.2d at 781-82; G & V Lounge, 23 F.3d 1075-76.

## B. PRIOR RESTRAINT

Ms. Belew contends that the Registration Act operates as an impermissible prior restraint on protected expression.

A "prior restraint" exists when speech is conditioned upon the prior approval of public officials. Nightclubs, Inc. v. City of Paducah, 202 F.3d 884, 889 (6th Cir. 2000); BJS No. 2, Inc. v. City of Troy, Ohio, 87 F. Supp.2d 800, 809-10 (S.D. Ohio 1999) ("[A]n ordinance that imposes upon a proprietor the burden of obtaining a permit in order to engage in constitutionally protected activity is properly analyzed as a prior restraint."). Although laws may validly prohibit certain types of expression not protected by the

14

First Amendment, a prior restraint on the exercise of First Amendment rights is "the most serious and least tolerable infringement on First Amendment rights." <u>Nebraska Press Ass'n v. Stewart</u>, 427 U.S. 539, 559, 96 S.Ct. 2781, 2803, 49 L.Ed.2d 683, 697 (1975).

> Prior restraints are presumptively invalid because they typically involve "two evils that will not be tolerated": (1) the risk of censorship associated with the vesting of unbridled discretion in government officials; and (2) "the risk of indefinitely suppressing permissible speech" when a licensing law fails to provide for the prompt issuance of a license.

<u>Nightclubs</u>, 202 F.3d at 889 (quoting <u>FW/PBS</u>, 493 U.S. at 225-27, 110 S.Ct. at 604-05, 107 L.Ed.2d at 618-19); <u>see FW/PBS</u>, 493 U.S. at 226, 110 S.Ct. at 605, 107 L.Ed.2d at 618 ("'[A]n ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official--as by requiring a permit or license which may be granted or withheld in the discretion of such official--is an unconstitutional censorship or prior restraint . . . .'") (citations omitted). "A licensing system need not effect total suppression in order to create a prior restraint." <u>Southeastern Promotions, Ltd. v. Conrad</u>, 402 U.S. 546, 557 n.8, 95 S.Ct. 1239, 1245 n.8, 43 L.Ed.2d 448, 458 n.8 (1975).

Accordingly, "'<u>[a]ny</u> system of prior restraints of expression [bears] a heavy presumption against its constitutional validity.'" <u>Vance v. Universal Amusement Co., Inc.</u>, 445 U.S. 308, 317,

15

100 S.Ct. 1156, 1162, 63 L.Ed.2d 413, 421 (1980)(quoting Bantam Books, 372 U.S. at 70, 83 S.Ct. at 639, 9 L.Ed.2d. at 593 (emphasis in original)(citations omitted)). Prior restraints against expression protected by the First Amendment are disfavored because "[i]t is difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable." Vance, 445 U.S. at 315 n.13, 100 S.Ct. at 1161 n.13, 63 L.Ed.2d at 420 n.13 (citations omitted).

In order to avoid constitutional infirmity on protected expression, a licensing scheme "must remove discretion from government officials" and provide certain procedural safeguards. J. L. Spoons, Inc. v. City of Brunswick, 49 F. Supp.2d 1032, 1038 (N.D. Ohio 1999); FW/PBS, 493 U.S. at 225-26, 110 S.Ct. at 605, 107 L.Ed.2d at 618; Southeastern Promotions, 402 U.S. at 559, 95 S.Ct. at 1247, 43 L.Ed.2d at 459. In Freedman supra, the Supreme Court invalidated a Maryland motion picture censorship statute under the First Amendment because the statute did not provide the necessary procedural safeguards in protecting against governmental infringement on protected expression. Freedman, 380 U.S. at 58-60, 85 S.Ct. at 738-40, 13 L.Ed.2d at 654-55. The Court determined that the following three procedural safeguards are required to avoid constitutional infirmity:

   (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status

16

quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court.

FW/PBS, 493 U.S. at 227, 110 S.Ct. at 606, 107 L.Ed.2d at 619 (citing Freedman, 380 U.S. at 58-60, 85 S.Ct. at 738-740, 13 L.Ed.2d at 654-55).

In FW/PBS, the Supreme Court applied Freedman to a Dallas, Texas, ordinance which required sexually oriented businesses to pass certain municipal inspections before they could obtain their mandatory licenses. However, in a plurality opinion, Justice O'Connor, joined by Justices Stevens and Kennedy, found that the Dallas licensing scheme did not present "the grave 'dangers of a censorship system'" as found in Freedman and concluded that not all three procedural safeguards were required. FW/PBS, 493 U.S. at 228, 110 S.Ct. at 606, 107 L.Ed.2d at 620. The plurality stated:

The core policy underlying Freedman is that the license for a First Amendment-protected business must be issued within a reasonable period of time, because undue delay results in the unconstitutional suppression of protected speech. Thus, the first two safeguards are essential: the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the event that the license is erroneously denied.

Id.

The plurality concluded that the third Freedman procedural safeguard--that the censor must bear the burden of going to court

17

to suppress the speech and must bear the burden of proof once in court--is inapplicable where a scheme does not require a public official to "engage in direct censorship of particular expressive material." Id., 493 U.S. at 229, 110 S.Ct. at 606-07, 107 L.Ed.2d at 620. The plurality distinguished the Dallas licensing scheme from the censorship scheme in Freedman by stating that the city of Dallas did not "exercise discretion by passing judgment on the content of any protected speech," and, instead, the city just reviewed the general qualifications of each applicant, "a ministerial action that is not presumptively invalid." Id., 493 U.S. at 229, 110 S.Ct. at 607, 107 L.Ed.2d at 621. In a concurring opinion, Justice Brennan, joined by Justices Marshall and Blackmun, opined that all three of the procedural safeguards articulated in Freedman must be applied to any system of prior restraint. Id., 493 U.S. at 239, 110 S.Ct. at 611-12, 107 L.Ed.2d at 626-27. (Brennan, J., concurring).

In analyzing Freedman and FW/PBS, the Sixth Circuit has stated:

> Although the status of the third Freedman requirement remains unclear in the licensing context, this Circuit has previously noted that, under FW/PBS, at least the first two Freedman safeguards are essential for a licensing scheme to comport with the First Amendment. See East Brooks Books, Inc. v. City of Memphis, 48 F.3d 220, 224 (6th Cir. 1995)(invalidating Memphis, Tennessee sexually oriented business ordinance that failed to ensure prompt judicial review). Thus, a licensing scheme must remove standardless discretion from government officials and contain two procedural safeguards: (1) the decision whether to issue a license must be made within

18

a specified brief period, and the status quo must be
maintained during that period and during judicial review,
and (2) there must be a "guarantee of prompt judicial
review."

Nightclubs, 202 F.3d at 890 (citation omitted); Deja Vu of
Nashville, 274 F.3d 401 n.5; Odle v. Decatur County, 421 F.3d 386,
390 (6th Cir. 2005).[7]

Ms. Belew contends that the Registration Act fails to set
adequate procedural protections as required by Freedman.
Specifically, she contends that the Act fails to require that the
board will act upon a permit application within a reasonable period
of time and that the licensing scheme fails to ensure a prompt
judicial review. She also contends that the Act neither allows an
applicant for a permit to engage in constitutionally protected
expression while initial consideration of the application is
pending before the board nor does it provide for a provisional or
conditional permit to issue pending administrative or judicial
review of the denial of a permit application. She further contends
that the Act fails to ensure that the administrative hearing
comports with procedural due process requirements and the Act fails

---

[7]In this case, the Court does not need to address whether or
not the third Freedman requirement should be included in the
Registration Act. Sections 7-51-1109(c), (f) and -1110(c), (e) of
the Act require the county attorney to institute suit for
declaratory judgment if the board affirms the denial, suspension or
revocation of an applicant's license or permit and prove that such
action by the board was not arbitrary or capricious.

19

to provide review of determinations by the licensing board for mere factual error.

The defendants contend that the Act does provide specific and reasonable time frames within which the board is to act and within which prompt judicial review is ensured. They also assert that the Registration Act does provide for the issuance of a conditional permit if the board needs more than thirty days to complete its initial investigation.

The Registration Act provides that a permit shall not be issued unless the board or sheriff's department has conducted an investigation into the applicant's qualifications. Tenn. Code Ann. § 7-51-1117(b). The results of the investigation are to be filed in writing with the board no later than thirty days after the date of the application for a permit. Id. Within ten days of receiving the results of the investigation, the board is required to notify the applicant as to whether or not the application is granted, denied or being held for further investigation. Tenn. Code Ann. § 7-51-1116(c). If further investigation is needed, it is not to exceed thirty days, unless the applicant agrees otherwise. Id. Once the investigation is concluded, the board is required to advise the applicant in writing whether the application is granted or denied. Id. This initial investigative and review process allows the board a maximum of seventy days to lapse before making an initial ruling on a permit application.

If the board denies an application, the chair is to notify the applicant in writing of the reasons for the denial and to advise the applicant that the applicant has the right to request a hearing before the board. Tenn. Code Ann. § 7-51-1110(b) (2003). The applicant must make such a request in writing to the county mayor within ten days of the applicant receiving the notification of denial. Id. Upon a timely request by the applicant, a public hearing will be held within 15 days of the county mayor's receipt of the applicant's request. At the hearing, the board is to hear evidence concerning the denial of the application and will either affirm or reverse the board's prior ruling at the conclusion of the hearing. The hearing shall be concluded no later than 22 days from the date of the applicant's initial receipt of the notification of denial, unless the applicant requests an extension beyond this time period that is granted by the board. Id.

### 1. acting within a reasonable period of time and ensuring prompt judicial review

Ms. Belew submits that if the board takes the maximum time allowed by the Registration Act in the entire administrative process and assuming that the notification of the board's initial denial takes a day or two to be delivered by mail, the Act allows for at least 93 or 94 days to lapse between the submission of a permit application and the conclusion of the administrative

21

hearing.[8, 9] She contends that this period of time to complete the administrative process constitutes an unconstitutional delay in violation of the Supreme Court's holding in Freedman, supra.[10] In support, she relies on Teitel Film Corp. v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968) and United States v. Thirty-Seven (37) Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971).

---

[8]The Registration Act also provides that if the board affirms the denial of an application, the county attorney shall institute suit for declaratory judgment in a court of record in the county, within five days of the board's affirmation. The applicant is then entitled to judicial determination of the issues within two days after joinder of issue, and a decision will be rendered by the court within two days of the conclusion of the hearing. Tenn. Code Ann. § 7-51-1110(c), (d).

[9]Tennessee Coded Annotated § 7-51-1109(b)(1)-(3), (c), (e) imposes the same time limits for an applicant to appeal the board's initial decision to revoke or suspend a permit and for the county attorney to seek judicial determination of the board's affirmation of denial regarding the revocation or suspension of a permit.

[10]Although Ms. Belew has not been issued a permit, she still has standing to challenge the licensing procedures governing revocation, suspension and renewal of permits because these procedures are basically the same as those governing the initial issuance of permits and each permit must be renewed each year. See Tenn. Code Ann. §§ 7-51-1104 to -1105, -1107, -1109 to -1111; see also Deja Vu of Nashville, 274 F.3d at 398-99.

> [T]he fact that no revocation proceedings are currently pending is immaterial; just as a plaintiff need not go through the formality of submitting an application in a facially unconstitutional licensing scheme, so too a current license-holder "does not have to wait until his license is revoked to have standing to challenge the allegedly overbroad licensing scheme that would allow its revocation."

DLS, 107 F.3d at 414 (citations omitted).

In <u>Teitel</u>, the Supreme Court held that a motion picture ordinance, which allowed 50 to 57 days to elapse during the administrative stage before the initiation of judicial proceedings, was unconstitutional. <u>Id</u>. The ordinance required an exhibitor of a film to submit such a film first to a censor before obtaining a permit to exhibit the film. <u>Id</u>., 390 U.S. at 140, 88 S.Ct. at 755, 19 L.Ed.2d at 968. The ordinance allowed the exhibitor to appeal a denial by the censor to an appeals board, and if the appeals board upheld the censor's decision, then the exhibitor was entitled to a hearing before the board. <u>Id</u>. If the appeals board ruled against the exhibitor, then the board was to file in court an action for injunction against the showing of the film. However, there was no statutory provision assuring that a prompt judicial decision would follow. <u>Id</u>., 390 U.S. at 140-41, 88 S.Ct. at 755, 19 L.Ed.2d at 969. The Supreme Court, relying on its decision in <u>Freedman</u>, found that the ordinance was unconstitutional in two respects:

> (1) The 50 to 57 days provided by the ordinance to complete the administrative process before initiation of the judicial proceeding does not satisfy the standard that the procedure must assure "that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film." (2) The absence of any provision for a prompt judicial decision by the trial court violates the standard that "the procedure must also assure a prompt final judicial decision . . . ."

<u>Id</u>., 390 U.S. at 141-42, 88 S.Ct. at 756, 19 L.Ed.2d at 969 (citation omitted).

23

Teitel, however, can be distinguished from the case at bar. In Teitel, the ordinance was content-based and provided for a censorship scheme as opposed to a licensing scheme, a difference the Supreme Court emphasized in FW/PBS. See also City of Littleton v. Z.J. Gifts D-4, L.L.C., 541 U.S. 774, 784, 124 S.Ct. 2219, 2226, 159 L.Ed.2d 84, 94 (2004) ("Where . . . the regulation simply conditions the operation of an adult business on compliance with neutral and nondiscretionary criteria . . . and does not seek to censor content, an adult business is not entitled to an unusually speedy judicial decision of the Freedman type."). Also, unlike the ordinance in Teitel, the Registration Act provides a specified time frame in which the board is to seek a declaratory judgment before a court which is to render its decision within two days of the conclusion of the hearing. See Tenn. Code Ann. §§ 7-51-1109(c), (e), -1110(c), (d).

Thirty-Seven (37) Photographs involved United States customs agents seizing 37 photographs for being obscene. The federal statute in question did not provide for explicit time limits as required by Freedman. In order to uphold the constitutionality of the statute, the Court examined the legislative history of the statute, forty years worth of cases sanctioning delays from 40 days to six months between the seizure of the obscene goods to the commencement of judicial proceedings, cases where the completion of judicial proceedings took as long as three to seven months, and

24

cases in the lower federal courts in which proceedings were brought under the challenged act. Thirty-Seven (37) Photographs, 402 U.S. at 371-373, 91 S.Ct. at 1406, 28 L.Ed.2d at 831-32. The Court construed the statute to require intervals of no more than 14 days from the seizure of the goods to the institution of judicial proceedings for their forfeiture and no longer than 60 days from the filing of the action to a final decision in the district court. Id., 402 U.S. at 373-74, 91 S.Ct. at 1407, 28 L.Ed.2d at 832. The Court reasoned that a possible delay of as much as 74 days did not seem to be an undue burden for importers engaged in the lengthy process of bringing goods into the United States. Id.

Like Teitel, Thirty-Seven (37) Photographs can be distinguished from the instant case. Thirty-Seven (37) Photographs involved a censorship scheme that authorized the forfeiture of alleged obscene materials. As discussed previously, the Registration Act is a licensing scheme and does not provide for the seizure of any materials in violation of the Act.

The Court finds that the Registration Act does provide for a reasonable and definite time in which a decision must be made. Although Ms. Belew contends that the administrative process could take up to 94 days before receiving prompt judicial review, the Court believes such occurrences would be the rare exception and not the rule. In East Brooks Books, the Sixth Circuit was concerned with the Memphis ordinance because three to five months could

25

possibly lapse after the administrative process before an applicant received judicial review. 48 F.3d at 225. The Court noted that although the Supreme Court had not expressly defined prompt judicial review, it believed that potential delays of over five months were impermissible. Id. The Registration Act does not suffer from such an infirmity, for it provides deadlines for the initiation of an action for declaratory judgment and judicial determination after joinder of issue.

Ms. Belew further asserts that the delay in the administrative process is exacerbated by the general rule in Tennessee that statutory provisions relating to the time of doing an act in which a statute applies are directory rather than mandatory.

> In general, when determining whether a procedural requirement of a statute is directory or mandatory, the object is to ascertain the legislative intent by consideration of the entire statute, including its nature and purpose, and the consequences that would result from a construction one way or the other. Directory provisions require only substantial compliance. Statutory provisions relating to the mode or time of doing an act to which the statute applies are ordinarily held to be directory rather than mandatory.

Presley v. Bennett, 860 S.W.2d 857, 860 (Tenn. 1993) (citations omitted).

Ms. Belew contends that this general rule conflicts with the constitutional imperative that a licensing scheme must reasonably ensure a prompt judicial determination, and not mere access to judicial review. Nightclubs, 202 F.3d at 892.

26

As has been stated previously, at least the first two _Freedman_ procedural safeguards are mandatory in a licensing scheme, and any act attempting to regulate adult-oriented businesses must have these mechanisms in place in order to survive constitutional review. Sections 7-51-1109 and -1110 of the Registration Act set forth the _Freedman_ procedural safeguards relating to the administrative and judicial review process. Throughout those provisions, the word "shall" is repeatedly used, leaving no ambiguity as to the legislature's intent that those provisions were to be mandatorily applied in accordance with the directive laid down in _Freedman_ and accompanying case law. Further, § 7-51-1110 was amended in 2001 to include subsection (f) which specifies, "The provisions of this part mandating judicial review shall control over general provisions for declaratory judgment actions in the event of any conflict." Accordingly, the Court finds that the statutory provisions relating to the administrative and judicial process are mandatory and not directory.

_2. conditional permit or maintaining the status quo_

Ms. Below further contends that the Act neither allows an applicant for a permit to engage in constitutionally protected expression while initial consideration of the application is pending before the board nor does it provide for a provisional or conditional permit to issue pending administrative or judicial review of the denial of a permit application. The defendants

27

contend that the Registration Act provides for an 120-day grace
period, in which the status quo is maintained for existing
entertainers. They contend that if an entertainer timely submits
an application then the board could rule on the application and, if
need be, a court could provide judicial review prior to the
expiration of the 120 day grace period.

Tennessee Code Ann. § 7-51-1104(e) (2001) provides:

All existing adult-oriented establishments, entertainers,
employees, escorts, or operators, at the time this part
is given local effect pursuant to § 7-51-1120, must
submit an application for an appropriate license or
permit within one hundred twenty (120) days of this part
becoming effective in such county. If a license is not
issued within such one hundred twenty-day period, then
such existing adult-oriented establishment shall cease to
operate.

Therefore, according to the defendants, an entertainer should
apply as soon as possible in order for the entertainer to receive
a decision within the 120-day period.[11] However, § 7-51-1104(e)
only requires that an entertainer file an application within 120
days of the county adopting the Registration Act. Presumably, an

---

[11]This issue was not presented to the Court in Odle, 421 F.3d
at 391-92. In that case, the plaintiffs argued that the
Registration Act does not allow first-time applicants with extant
businesses to enjoy the status quo while they wait a final judicial
determination on their application. The Court noted that the
plaintiffs did not address the 120-day grace period but instead
argued that the only constitutionally acceptable way to maintain
the status quo was by the issuance of temporary permits that expire
after a final determination on the merits. The Sixth Circuit
stated that the rule is simply that the status quo must be
maintained, and assessing the Registration Act on its face, it
could not say that the 120-day grace period was insufficient in
upholding the status quo requirement. Id.

28

entertainer should be able to file an application for a permit on the 120th day of the Registration Act's adoption and still be in compliance with § 7-51-1104(e). Although § 7-51-1104(e) states that if an entertainer is not issued a permit within the 120 days then that entertainer must refrain from performing,[12] the Court finds this provision is invalid.

"The status quo for a business seeking a permit to begin operating a sexually oriented business . . . is non-operation." East Brooks Books, 48 F.3d at 225; TK's Video, Inc. v. Denton County Texas, 24 F.3d 705, 708 (5th Cir. 1994) ("[A]n applicant for a license not in business when the Order was adopted is not free to operate while its license is pending."). Compare N.W. Enters., Inc. v. City of Houston, 27 F. Supp.2d 754, 846 (S. D. Tex. 1998) ("[T]he City is not required to allow a manger or entertainer who has *not* been working in a sexually oriented business immediately before the requirement goes into effect to commence such work until a permit is actually issued.") (emphasis in original). Likewise, the status quo for a person seeking a permit to begin employment in an adult-oriented establishment is non-employment.[13] However, Ms.

_____

[12]Although the last sentence literally reads, "If a *license* is not issued . . ., then such existing *adult-oriented establishment* shall cease *to operate*," the Court construes this phrase, read in context with the rest of the statute which was amended in 2001 to include all existing entertainers, employees, escorts, or operators, to reference entertainers seeking permits as well.

[13]The Court notes that the Registration Act does allow an applicant for a permit to begin working as an entertainer if

29

Below testified that she was dancing at the Watering Hole, an adult-oriented establishment adjacent to Club Utopia, in 1999 prior to the adoption of the Registration Act. Therefore, she is an "existing entertainer" as contemplated in § 7-51-1104(e) (2001).[14]

Freedman and FW/PBS require that the status quo be maintained, pending decision as to whether a license should issue. In discussing the issue of the status quo being maintained for existing businesses in a Memphis City ordinance, the Court in East Brooks Books noted, "[T]he ordinance has been amended to allow sexually oriented businesses in operation at the time the ordinance becomes effective to continue operating while their applications are pending. At least in the case of a permit denial, [FW/PBS] does not require more." East Brooks Books, 48 F.3d at 225. Also, in TK's Video, the United States Court of Appeals for the Fifth Circuit stated:

_____

additional investigation is required and thirty days have expired from the applicant's initial application without the board having made a decision. Tenn. Code Ann. § 7-51-1116(d) (2001). Of course, once issued the status quo of the permit changes from non-operation to operation, and the board cannot arbitrarily take away the permit. Kentucky Rest. Concepts, Inc. v. City of Louisville, 209 F. Supp.2d 672, 698 (W.D. Ky. 2002)

[14]Although MS. Below elected not to file an application, as stated previously, she has standing to challenge this provision on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not her conduct could be proscribed by a properly drawn statute, and whether or not she applied for a license. Freedman, 380 U.S. at 56, 85 S.Ct. at 737, 13 L.Ed.2d at 653.

> Maintaining the status quo means in our view that the
> County cannot regulate an existing business during the
> licensing process. . . . Businesses engaged in activity
> protected by the First Amendment are entitled to more
> than the grace of the State. The regulating order does
> not address the problem. The order maintains the status
> quo pending judicial review for licenses facing
> suspension or revocation. . . . Because TK's was in
> business when the Order was adopted, its free speech
> activity cannot be suppressed pending review of its
> license application by the County.

24 F.3d at 708.

Because § 7-51-1104(e) does not allow an "existing
entertainer" to continue working as an entertainer or be issued a
temporary permit to continue working in an adult-oriented
establishment, pending the initial decision to issue a permit and
subsequent judicial review of that decision, the Court finds § 7-51-1104(e) to be invalid. For the same reason, the Court also
finds that § 7-51-1110(b) is invalid insofar as it fails to
preserve the status quo during the administrative process for
permit renewals or pending judicial review of decisions not to
renew permits. See Nightclubs, 202 F.3d at 891; Kentucky Rest.
Concepts, Inc. v. City of Louisville, 209 F. Supp.2d 672, 697 (W.D.
Ky. 2002).[15, 16]

---

[15]Section 7-51-1111(g) does provide that if a permit renewal
application is denied the applicant has all rights of appeal as
provided in § 7-51-1110. However, there is no provision in § 7-51-1110 which maintains the status quo during the administrative
process or pending judicial review of a decision denying renewal.

[16]The Court notes that § 7-51-1109(b)(2) provides for the
maintaining of the status quo, pending the final outcome of
judicial proceedings, for those whose permits have been either

### 3. procedural due process

Ms. Belew next contends that the Registration Act fails to
ensure that the administrative hearing comports with procedural due
process requirements. Specifically, she contends that the Act does
not provide which party bears the burden of proof or what standards
of proof or review apply.[17] She further contends that the Act does
not provide an unsuccessful applicant subpoena power or any other
means of compulsory process to procure the attendance of witnesses
or ensure the production of documentary evidence. Lastly, she
contends that although the Act provides an avenue for judicial
review and deadlines for the institution of a declaratory judgment
action and for the rendering of a decision after joinder of issue,
there is no provision requiring the board to expeditiously effect
service of process in such an action in order to avoid a
significant delay between the institution of the action and joinder
of issue. The defendants failed to address this issue.

revoked or suspended.

[17]Tennessee Code Ann. §§ 7-51-1109(f), -1110(e) state that the
board shall have the burden of showing that a denial, revocation or
suspension of a permit was not arbitrary or capricious. The
plaintiff asserts that it is unclear whether the provision refers
only to the declaratory judgment action or to the administrative
hearing as well. She argues that since it would be unlikely for a
tribunal to conclude that its earlier decision was arbitrary or
capricious then the more logical interpretation of the sections
would be that the arbitrary or capricious standard is only applied
in the declaratory judgment action and not at the administrative
hearing.

The Supreme Court has consistently held that an individual is entitled to some form of hearing before being deprived of a property interest. <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 32 (1976). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" <u>Id</u>. Whether the administrative procedures provided are constitutionally sufficient in giving an individual a meaningful opportunity to be heard depends upon the governmental and private interests affected. Accordingly,

> due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

<u>Id</u>., 424 U.S. at 334-35, 96 S.Ct. at 902-03, 47 L.Ed.2d at 33; <u>Newsom v. Vanderbilt Univ.</u>, 653 F.2d 1100, 1123 (6th Cir. 1981).

After considering these factors, the Court finds that the plaintiff's contentions regarding the administrative procedures are without merit. While the plaintiff's private interest is significant, as stated previously, sexually explicit expression, while protected under the First Amendment, is the type of expression that society has less interest in protecting and therefore falls within the outer perimeters of expression protected

33

by the First Amendment. American Mini Theatres, supra; Barnes, supra. As discussed supra, the Registration Act provides a public administrative hearing on a plaintiff's permit denial and prompt judicial review if the permit denial is affirmed in accordance with Freedman and Deja Vu of Nashville. However, the plaintiff argues that the Act fails to provide which party bears the burden of proof or what standards of proof or review apply during the administrative hearing; that an unsuccessful applicant lacks subpoena power; and there is no requirement that the board is to effect service of process expeditiously. These complaints focus on the second factor of consideration.

Although it is unclear as to whether the arbitrary or capricious standard of review applies or who bears the burden of proof at the administrative hearing, the plaintiff fails to show how the administrative procedures provided in the Registration Act are insufficient in giving an individual a meaningful opportunity to be heard. The Registration Act clearly provides an applicant with the opportunity to be heard at a public hearing and subsequent judicial review of an adverse decision before being deprived of a property interest. The burden is clearly on the board at the judicial hearing to prove that a denial of an application was not arbitrary or capricious. Tenn. Code Ann. § 7-51-1110(e). Thus, the minimum requirements of procedural due process are met.

34

In support of her argument, the plaintiff cites this Court's opinion in Ellwest Stereo Theater, Inc. v. Boner, 718 F. Supp. 1553, 1580 (M.D. Tenn. 1989), where this Court noted that there was nothing in the challenged ordinance that provided which party bore the burden of proof or what the standards of proof or review were. However, the ordinance in that case suffered from fundamental flaws as there was no requirement that a prompt disposition would be made of the aggrieved party's complaint or that there would be an opportunity for judicial review prior to the revocation or suspension of a license or permit. See id. Thus, unlike the Registration Act, the ordinance forced a permit holder who had his or her permit suspended or revoked to forgo the exercise of his or her First Amendment rights until a decision on appeal could be made. Because the Act does not suffer from such infirmity, the Court finds this contention is without merit.[18]

The plaintiff next argues that an applicant's lack of subpoena power during the administrative hearing is violative of procedural due process. However, the "inability to subpoena witness[es] is not a per se violation of [an applicant's] right to procedural due process." United States v. Woods, 931 F. Supp. 433, 441 (E.D. Va. 1996). Under the Registration Act, an aggrieved party has the

---

[18]As stated previously, § 7-51-1110(b) governing renewals is invalid insofar as it fails to preserve the status quo during the administrative process for permit renewals or pending judicial review of decisions not to renew permits.

right to a hearing and to present evidence. There is no showing that an aggrieved party will be unfairly prevented from providing sufficient evidence at the hearing or that a subpoena is particularly necessary. Further, the aggrieved party's recourse to an adverse decision is through the safeguard of requiring the board to submit its decision for judicial review while the party's status quo is maintained. The plaintiff does not cite any authority in support of her contention that subpoena power is a requirement under procedural due process. To be sure, under Mathews there may be situations where procedural due process dictates that an aggrieved party possess subpoena power. However, the Court is not confronted with such a situation, and there is not any information before it for the Court to say that the Act facially works an injustice without such a requirement. Id. at 442.

Lastly, the plaintiff contends that there is no guarantee that the board will expeditiously effect service of process between the institution of an action for declaratory judgment and joinder of issue. The Court disagrees. Section 7-51-1110(d) states that "[t]he applicant *shall cooperate* in expediting completion of service of process by the board when initiating a declaratory action under this part." The Court reads the phrase, "shall cooperate," as requiring both the applicant and the board to act in concert in expediting service of process. As defined in Webster's Ninth New Collegiate Dictionary 288 (1985), "cooperate" means "to

36

act or work with another or others: act together." Accordingly, the Court finds the plaintiff's contention is without merit.

## 4. arbitrary or capricious standard

Ms. Belew contends that the "arbitrary or capricious" and "clearly erroneous" standards of review employed by Tenn. Code Ann. §§ 7-51-1109(f), -1110(e) fail to ensure that an unsuccessful applicant will be afforded judicial review of the board's determinations for mere factual error.[19] The defendants contend that such a standard for judicial review has not been shown to be constitutionally defective.

In Tennessee, the "arbitrary or capricious" standard of review allows reviewing courts to give much deference to the broad discretionary powers of local governmental bodies, and judicial review is thereby limited in scope. McAllen v. City of Memphis, 786 S.W.2d 633, 640 (Tenn. 1990). In McAllen, the Tennessee supreme court stated:

The "fairly debatable, rational basis," as applied to legislative acts, and the "illegal, arbitrary and capricious" standard relative to administrative acts are essentially the same. In either instance, the court's primary resolve is to refrain from substituting its judgment for that of the local governmental body. An action will be invalidated only if it constitutes an abuse of discretion. If "any possible reason" exists

---

[19]Tennessee Code Ann. §§ 7-51-1109(f), -1110(e) (2001) state that the board shall have the burden of showing that a denial, revocation or suspension of a permit was not arbitrary or capricious and that if a decision by the board is found to be clearly erroneous, the court may overturn the decision as being arbitrary or capricious.

37

justifying the action, it will be upheld. Both legislative and administrative decisions are presumed to be valid and a heavy burden of proof rests upon the shoulders of the party who challenges the action.

Id. at 641.

The plaintiff contends that the phrases, "clearly erroneous" and "arbitrary or capricious," are essentially interchangeable and that this stringent standard of review fails to comport with the requirements of FW/PBS and Freedman, which require denials that are merely erroneous, rather than "clearly erroneous" or "arbitrary or capricious," be subject to judicial review. The Court disagrees.

In FW/PBS the Supreme Court stated, "[T]here must be the possibility of prompt judicial review in the event that the license is erroneously denied." FW/PBS, 493 U.S. at 228, 110 S.Ct. at 606, 107 L.Ed.2d at 620 (emphasis added). When making that statement, the Court was distinguishing between the procedural protections required under a licensing scheme as opposed to a censorship scheme. The Court was merely summarizing the procedural protections espoused by the Court in Freedman and was explaining that not all of those protections set forth in Freedman were required. FW/PBS, 493 U.S. at 228, 110 S.Ct. at 606, 107 L.Ed.2d at 620. The Court in FW/PBS stated, "The core policy underlying Freedman is that the license for a First Amendment-protected business must be issued within a reasonable period of time, because undue delay results in the unconstitutional suppression of protected speech." Id. The Court went on to conclude:

38

Thus, the first two safeguards are essential: the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the event that the license is erroneously denied.

Id.

The Court in FW/PBS was clearly concerned with an applicant receiving prompt judicial review of an adverse decision by the board. There is no mention by the Court as to what standard of review a court should utilize in reviewing a decision by a licensing board. Likewise, in formulating its procedural requirements in Freedman, the Court stated, "[T]he procedure must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license." Freedman, 380 U.S. at 59, 85 S.Ct. at 739, 13 L.Ed.2d at 655. Again, the Court in Freedman was concerned with an applicant receiving prompt judicial review of an adverse decision by the board. The reference to an "erroneous denial" does not specify a standard of judicial review but instead is a generic reference to an incorrect decision by a licensing board.

Further, the plaintiffs have not shown that the "arbitrary or capricious" or "clearly erroneous" standard of review is constitutionally inadequate. Tennessee law provides that an action will be invalidated if a local governmental body acted with an abuse of discretion. McAllen, 786 S.W.2d at 641. In McAllen, the court stated:

39

If the exercise of authority by the governmental body can
be classified as arbitrary or capricious, courts have
routinely provided relief:

> [An] abuse of discretion means action that is
> in opposition to the intent and policy of the
> statute and of the ordinance adopted
> comfortably to its provisions, as applied to
> the facts and circumstances of the case.

Id. at 640-41 (citation omitted). The Court finds that this
standard of review is sufficient in fulfilling the constitutional
requirements as set forth in Freedman and FW/PBS. Accordingly, the
plaintiff's contention fails.

V.

Under our First Amendment jurisprudence, protected expressions
may be subject to "reasonable time, place or manner" restrictions.
Barnes, 501 U.S. at 566, 111 S.Ct. at 2461, 115 L.Ed.2d at 511
(1991)(citing Clark v. Community for Creative Non-Violence,
468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221, 227
(1984)). Such a regulation is valid:

1. If it is within the constitutional power of the
government;
2. If it furthers an important or substantial
governmental interest;
3. If the government interest is unrelated to the
suppression of free expression; and
4. If the incidental restriction on alleged First
Amendment freedoms is no greater than is essential to the
furtherance of that interest.[20]

---

[20]In Clark, the Supreme Court noted that the four part O'Brien
test for reviewing the constitutionality of regulations of
expressive conduct is really the same test as that for time, place
or manner regulations. Clark, 468 U.S. at 298, 104 S.Ct. at 3070,
82 L.Ed.2d at 230. This test asks whether the law is content

40

Id., 501 U.S. at 567, 111 S.Ct. at 2461, 115 L.Ed.2d at 512 (quoting United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672, 680 (1968)). The Sixth Circuit and other courts have applied this test when reviewing the constitutionality of laws regulating sexually oriented businesses. See DLS, 107 F.3d at 410; Ellwest Stereo Theater, Inc. v. Boner, 718 F. Supp. 1553, 1562 (M.D. Tenn. 1989); Genusa v. City of Peoria, 619 F.2d. 1203, 214 n.27 (7th Cir. 1980).

Because the rest of the plaintiff's "prior restraint" claims deal more with time, place and manner restrictions, her remaining claims in this part will be analyzed using the four-part O'Brien test. Deja Vu of Nashville, 274 F.3d at 391-93.

With regard to the first factor, whether such regulation is within the constitutional power of the government, there is no contention by the plaintiffs that Giles County lacks the authority to adopt the Registration Act. Therefore, the Court will address the remaining three factors.

The second factor pertains to whether the regulation furthers an important or substantial governmental interest. The preamble to the Registration Act states that the purpose of the act is "to promote the health, safety, morals and general welfare of the citizens of the State, and to establish reasonable and uniform

---

neutral, is "designed to serve a substantial government interest, and allows alternative avenues of communication." Richland Bookmart, 137 F.3d at 440.

regulations to prevent the deleterious location and concentration of sexually-oriented businesses within this state." 1998 Tenn. Pub. Acts 1090. Specifically, the preamble reveals that the legislature wanted to address problems associated with sexually-oriented businesses such as unlawful sexual activities, prostitution, the spread of sexually transmitted diseases and the deterioration of surrounding neighborhoods. In Barnes, the Supreme Court upheld Indiana's public indecency statute which was "designed to protect morals and public order," stating that "[t]he traditional police powers of the States is defined as the authority to provide for the public health, safety, and morals and we have upheld such as a basis for legislation." Barnes, 501 U.S. at 569, 111 S.Ct. at 2462, 115 L.Ed.2d at 513. Moreover, a "city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect." American Mini Theatres, 427 U.S. at 71, 96 S.Ct. at 2452, 49 L.Ed.2d at 327.

Thus, the concerns stated in the preamble are substantial. Deja Vu of Nashville, 274 F.3d at 392. Accordingly, the Court finds that the Registration Act was promulgated to further an important and substantial governmental interest.

With regard to the third O'Brien factor, whether the government interest is unrelated to the suppression of free expression, the Court finds that the Registration Act pertains exclusively to sexually explicit expression. However, because the

42

Registration Act focuses on the secondary effects of the expression, it will be treated as a content-neutral time, place or manner regulation.[21]  Richland Bookmart, 137 F.3d at 439-40. Therefore, the third element of the O'Brien test has been met.

The fourth factor of the O'Brien test requires that an incidental restriction on alleged First Amendment freedoms be no greater than is essential to the furtherance of that interest.  The requirement that a regulation must be narrowly tailored to serve the government's interest does not require that the regulation be the "least restrictive or least intrusive means of doing so."  Ward v. Rock Against Racism, 491 U.S. 781, 798, 109 S.Ct. 2746, 2757-58, 105 L.Ed.2d 661, 679 (1989).  Instead, a time, place or manner regulation is narrowly tailored "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest."  Id., 491 U.S. at 800, 109 S.Ct. at 2758,

---

[21]In Richland Bookmart, 137 F.3d at 439-40, the Sixth Circuit found that a regulation which focused exclusively on sexually explicit speech was content-specific on its face.  However, the Court explained that although content-specific regulations are generally presumed to be unconstitutional and are subject to strict scrutiny, the Supreme Court has created a legal fiction under which regulations of erotic or sexually explicit expression are treated as if they are content-neutral provided that the regulation is really aimed at the secondary effects of the speech, rather than at the speech itself.  Id. at 440 (citing City of Renton, 475 U.S. 41, 49, 106 S.Ct. 925, 929-30, 89 L.Ed.2d 29, 38-40 (1986) and American Mini Theatres, 427 U.S. at 70, 96 S.Ct. at 2452, 49 L.Ed.2d at 340).  The Supreme Court explained that regulations focusing on sexually explicit expression may be treated differently than regulations of other expression because the interest in protecting sexually explicit speech is marginal.  American Mini Theatres, 427 U.S. at 72, 96 S.Ct. at 2452, 49 L.Ed.2d at 340.

105 L.Ed.2d at 679.   This factor will be discussed below in relation to the plaintiff's specific claims.

## A. COMPULSORY DISCLOSURE REQUIREMENTS INFRINGING
## UPON CONSTITUTIONAL RIGHT TO PRIVACY

Ms. Belew contends that Tenn. Code Ann. § 7-51-1116(e) infringes upon her fundamental rights of privacy and association. That section provides:

> Failure or refusal of the applicant to give any information relevant to the investigation of the application, or the applicant's refusal or failure to appear at any reasonable time and place for examination under oath regarding the application, or the applicant's refusal to submit to or cooperate with any investigation required by this part, constitutes an admission by the applicant that the applicant is ineligible for such permit, and is grounds for denial thereof by the board.

Tenn. Code Ann. § 7-51-1116(e).

The Supreme Court has held that "compelled disclosure, in itself, can seriously infringe on the privacy of association and belief guaranteed by the First Amendment." Buckley v. Valeo, 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659, 713 (1976). Similarly, the Supreme Court has held that it is "immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters." NAACP v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488, 1498-99 (1958). In order for a governmental instrumentality to be constitutionally able to infringe upon this right, it is necessary that there be a substantial relationship between the information sought to be disclosed and a significant governmental interest to

44

be furthered by such disclosure. Buckley, supra; Gibson v. Florida Legislative Comm., 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); NAACP v. Alabama, supra. This strict standard was enunciated by the Supreme Court due to concern over the effect disclosure would have on individuals and groups involved in the advocacy of unpopular political ideas.

However, this strict standard does not necessarily apply when the type of association involved is one in which individuals have joined together for the purpose of engaging in profit-making activity and when the speech in question is a "type of expression [which] is of a wholly different, and lesser magnitude, than the interest in untrammelled political debate," such as the sexually-oriented expression at issue in this case. American Mini Theatres, 427 U.S. at 70, 96 S.Ct. at 2452, 49 L.Ed.2d at 326. In American Mini Theatres, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment does not prohibit the separate statutory classification of adult-oriented establishments from other businesses, even though First Amendment rights may be impacted thereby, so long as the classification is based on rational and reasonable grounds and done in furtherance of an important and substantial government interest. Id. Therefore, disclosure requirements regarding the application for a permit may be more stringent than those imposed on other First Amendment

45

protected enterprises. <u>See</u> <u>Ellwest Stereo Theater</u>, 718 F. Supp. at 1566-67.

Section 7-51-1116(e) provides that an applicant will be ineligible for a permit if he or she does not comply with the investigation process. The plaintiff argues that this provision allows the board unfettered discretion in requiring an applicant to disclose <u>any</u> information which the board may choose and that is not reasonably related to the purpose of the Registration Act.

The Court disagrees. Section 7-51-1116(e) requires an applicant to give information that is "<u>relevant</u> to the investigation of the application." Tennessee Code Ann. § 7-51-1116(b) sets forth specific criteria which must be met by an applicant seeking to obtain a permit.[22] The use of the word "relevant" in § 7-51-1116(e) is clearly in reference to the

_____

[22]Section 7-51-1116(b) provides that an applicant for a permit must provide his or her name and address, including any aliases, be at least eighteen years of age, make a statement of familiarity and compliance with the provisions of the Registration Act, provide information regarding the adult-oriented business permit history of the applicant and whether such permit had been revoked or suspended, and provide the physical description of the applicant along with two photographs of the individual. An applicant is also disqualified from receiving a permit if his or her permit has been revoked within the last two years. <u>Id</u>,. § 7-51-1117(a)(2). Further, an applicant is disqualified from receiving a permit if he or she has been convicted of any "specified criminal acts," as defined in § 7-51-1102(25) (2003), within the last two to five years, depending if the crime was a misdemeanor or felony, and if the applicant fails or refuses to provide relevant information regarding the investigation of the application, fails or refuses to appear at any reasonable time or place for examination under oath or fails or refuses to cooperate with any investigation concerning the application. <u>Id</u>., §§ 7-51-1116(e), -1117(a)(3).

46

information which is required to be disclosed under § 7-51-1116(b).
The Court finds that § 7-51-1116(e), read in context with § 7-51-
1116(b), requires only that information which is necessary in
identifying an applicant and furthering the government's interest
in combating negative secondary effects in a reasonable manner.
See Deja Vu of Nashville, 274 F.3d at 394. Accordingly, the
plaintiff's claim that the compulsory disclosure requirements
pursuant to Tenn. Code Ann. § 7-51-1116(e) infringe upon her
constitutional right to privacy fails.

The plaintiff also contends that the disclosure requirements
under the permit renewal provisions of the Registration Act are
more onerous than the provisions governing the initial applications
for permits. Specifically, she contends that Tenn. Code Ann. § 7-
51-1111(d) infringes upon her fundamental rights of privacy and
association. She argues that this provision is not even limited by
the "relevance" standard employed in § 7-51-1116(e). The
defendants argue that § 7-51-1111(d) only requires that an
applicant supply relevant information when seeking renewal of a
permit.

As originally enacted, the disclosure requirement in § 7-51-
1111(d) (1998) acted as an unconstitutional restraint on the
plaintiff's First Amendment rights. Unlike § 7-51-1116(e), § 7-51-
1111(d) did not limit its disclosure requirement to just "relevant"
information. Instead, the disclosure requirement of § 7-51-1111(d)

47

was open-ended and allowed the board unfettered discretion in subjectively determining what additional information an applicant had to provide in order to obtain a license renewal.

However, § 7-51-1111(d), as amended in 2001, now states in pertinent part:

> The application for renewal shall be upon a form provided by the board and shall contain such information and data relative to the renewal request (such as the applicant's qualifications, or whether there are grounds for denying the renewal), given under oath or affirmation, as may be required by the board.

Tenn. Code Ann. § 7-51-1111(d) (2001). Like "relevant", the Court reads "relative" to refer to that information which is required to be disclosed under § 7-51-1116(b). Thus, this amendment clears up any question of constitutional infirmity with regard to §7-51-1111(d). Accordingly, the Court finds that Tenn. Code Ann. § 7-51-1111(d), as amended, does not infringe upon the plaintiff's fundamental rights of privacy and association.

Ms. Belew further contends that the record-keeping provisions imposed on the operators under Tenn. Code Ann. § 7-51-1113(a), (b) infringe upon an employee's right to privacy. That section provides:

> (a) The operator shall maintain a register of all employees, showing the name, the aliases used by the employee, home address, age, birth date, sex, height, weight, color of hair and eyes, telephone number, social security number, driver license number, date of employment and termination, and duties of each employee, and such other information as may be required by the board. The above information on each employee shall be

48

maintained in the register on the premises for a period
of three (3) years following termination.

(b) The operator shall make the register of employees
available immediately for inspection by the board and/or
sheriff's department upon demand of a member of the board
or sheriff's department at all reasonable times.

Id. (emphasis added). She contends that these provisions vest the
board with unfettered discretion in requiring the collection and
maintenance of information well beyond what is necessary in
effectuating the ostensible purpose of the regulatory act. The
defendants contend that the information required in the register is
no more burdensome than necessary in furthering the state's
interests in preventing negative secondary effects.

The Court finds that the record-keeping provisions in § 7-51-
1113(a), (b) are unconstitutional because they grant the board
unfettered discretion to require any information that the board
chooses. See Ellwest Stereo Theater, 718 F. Supp. at 1575. Unlike
§ 7-51-1116(e), § 7-51-1113(a) does not limit its record-keeping
requirement to just "relevant" information. Instead, § 7-51-
1113(a) is open-ended and allows the board unfettered discretion in
subjectively determining what additional information an applicant
must provide in the register. Accordingly, the Court finds that
the record-keeping requirement under § 7-51-1113(a) is
unconstitutional insofar as it permits the board unfettered
discretion to require "such other information as may be required"
by it. Likewise, subsection (b) is invalid insofar that the

49

keeping of the register includes "such other information as may be required by the board."

Next, Ms. Below contends that § 7-51-1116(b) violates her right to privacy because it requires that an applicant for a permit disclose certain personal information, which will be made accessible to the general public via the Tennessee Public Records Act, codified as Tenn. Code Ann. § 10-7-503(a). Specifically, she alleges that employment as a dancer in an adult-oriented establishment poses certain risks to an entertainer's personal security and bodily integrity. She asserts that dancers may attract unwelcome attention and be subject to stalking by patrons. To counter this threat, dancers will often dance under stage names. She alleges that the placing of an entertainer's personal, identifying information into the public domain will have a chilling effect upon an entertainer's willingness to engage in constitutionally protected expression, i.e, performing dance routines of a sexual nature. The defendants dispute these assertions as having no merit.

An individual's decision to remain anonymous is an aspect of freedom of speech that is protected by the First amendment. McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 342, 115 S.Ct. 1511, 1516, 131 L.Ed.2d 426, 436 (1995). "The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a

50

desire to preserve as much of one's privacy as possible." Id., 514
U.S. at 341-42, 115 S.Ct. at 1516, 131 L.Ed.2d at 436. The purpose
of the First Amendment is "to protect unpopular individuals from
retaliation-and their ideas from suppression-at the hand of an
intolerant society." Id., 514 U.S. at 357, 115 S.Ct. at 1524, 131
L.Ed.2d at 446; Deja Vu of Nashville, 274 F.3d at 394. While
"[a]nonymity is a shield from the tyranny of the majority,"
McIntyre, supra, "it is not a shield from all legitimate
regulation." Deja Vu of Nashville, 274 F.3d at 395. A court must
consider the value of the speech involved. Watchtower Bible and
Tract Soc'y of New York, Inc., 536 U.S. 150, 161, 122 S.Ct. 2080,
2087, 153 L.Ed.2d 205, 216 (2002).

Section 7-51-1116(b) requires that an applicant for a permit
must provide, inter alia, his or her name and address, including
all aliases, weight, color of eyes and hair, proof that the
applicant is at least 18 years of age, similar business permit
history of the applicant and two portrait photographs. Section 10-
7-503(a) provides the following:

> Except as provided in § 10-7-504(f), all state, county
> and municipal records and all records maintained by the
> Tennessee performing arts center management corporation,
> except any public documents authorized to be destroyed by
> the county public records commission in accordance with
> § 10-7-404, shall at all times, during business hours, be
> open for personal inspection by any citizen of Tennessee,
> and those in charge of such records shall not refuse such

51

right of inspection to any citizen, unless otherwise provided by state law.[23]

Ms. Below asserts that where a government releases private information, which places an individual at a substantial risk of serious bodily harm from a perceived likely threat, such disclosure implicates a constitutional liberty interest and the government must show a compelling interest that is narrowly drawn to effectuate that interest.

In Kallstrom, supra, undercover police officers sued the city because it released personal information found in their personnel files to the defense counsel of several defendants involved in a large drug conspiracy, against whom the plaintiffs testified. 136 F.3d at 1059. The information consisted of the officers' addresses and phone numbers, the names, addresses and phone numbers of immediate family members and copies of their drivers' licenses. After receiving this information, the defense counsel passed it onto his clients, who were members of a violent gang and known for their propensity for violence and intimidation. Id.

The Sixth Circuit found that the officers' privacy interests did implicate a fundamental liberty interest, "specifically in preserving their lives and the lives of their family members, as well as preserving their personal security and bodily integrity." Id. at 1062. The Court stated:

---

[23]The exceptions listed in that section do not apply in this case.

52

We see no reason to doubt that where disclosure of this personal information may fall into the hands of persons likely to seek revenge upon the officers for their involvement . . . the City created a very real threat to the officers' and their family members' personal security and bodily integrity, and possibly their lives. Accordingly, we hold that the City's disclosure of this private information about the officers to defense counsel . . . rises to constitutional dimensions, thereby requiring us . . . to balance the officers' interests against those of the City.

Id. at 1063 (footnotes omitted). In determining whether the city's actions served a compelling purpose, the Court went on to state that although there could be situations which called for the release of the type of information in question, the facts presented before it did not warrant such an occasion. The Court therefore concluded that the disclosure of the personal information did not narrowly serve the state's interest in ensuring accountable governance. Id. at 1065.

Applying this reasoning in Deja Vu of Nashville, the Sixth Circuit found that "all sexually oriented business license and permit applicants' names and current and past residential addresses constitute protected private information and are therefore exempt from Tennessee's Open Records Act." 274 F.3d at 395. The Court found that although the city could not publicly release such private information it could require applicants to provide identifying information to the licensing board for the limited purposes of ensuring compliance with the ordinance's regulations, provided that the city kept the information under seal. Id.

53

Accordingly, the Court finds that based on the Court's opinion in <u>Deja Vu of Nashville</u> the plaintiff's claim fails as the identifying information provided to the board is exempted from the Open Records Act and the disclosure requirements only pose an incidental burden on an applicant.

Lastly, Ms. Belew contends that Tenn. Code Ann. § 7-51-1113(j) does not explicitly specify what information is to be listed on an entertainer permit. Section 7-51-1113(j) states that a "permit shall be kept by an employee, entertainer, or escort so that it is readily available for display immediately upon request of a customer, any member of such county sheriff's department, any board member, or any person designated by the board." She asserts that nothing explicitly specifies what information is to be listed on an entertainer permit and that to the extent that the permit includes the entertainer's name, § 7-51-1113(j) unconstitutionally impinges upon the entertainer's First Amendment right to anonymously engage in protected expression.

The Registration Act does not specifically state what information is to be displayed on a permit. In its response to a set of interrogatories, see plaintiff's exhibit 3, ¶ 21, the board stated that the information to be listed on an entertainer's permit would include the name of the entertainer, permit number, expiration date and possibly a picture or other descriptive information of the entertainer.

54

Based on its prior findings, the Court finds that the inclusion of an entertainer's name does not impinge on an applicant's First Amendment right to anonymously engage in protected expression as such a requirement is essential to ensuring compliance with and effectuating the purpose of the Registration Act. Deja Vu of Nashville, supra. However, in accordance with the rationale articulated in Deja Vu of Nashville, the Court finds that, to the extent that identifying information, such as an entertainer's name, is included on an entertainer's permit, the provision requiring an "entertainer" to show his or her permit to a "customer" upon that customer's request is invalid as it would require an entertainer to release to members of the general public the same private information that is exempted from Tennessee's Open Records Act. Accordingly, § 7-51-1113(j) is invalid to the extent that it requires an entertainer to produce protected private information to a customer.

## B. FEE REQUIREMENTS

Section 7-51-1118(b) requires that an applicant submit a $100 fee for a permit. The plaintiff asserts that this fee imposes a charge upon the exercise of her constitutional rights that exceeds the nominal sum which may validly be imposed as a regulatory measure to defray the reasonable expenses of the licensing system. The defendants contend that the fee requirement is constitutional

in the administration of the statutory requirements of the
Registration Act.

It is well established that the government may not tax the
exercise of a constitutionally protected right. Northeast Ohio
Coalition for the Homeless v. City of Cleveland, 105 F.3d 1107,
1109 (6th Cir. 1997). However, "an ordinance requiring a person to
pay a license or permit fee before he can engage in a
constitutionally protected activity does not violate the
Constitution so long as the purpose of charging the fee is limited
to defraying expenses incurred in furtherance of a legitimate state
interest." Id. at 1109-1110. Such a fee is not excessive, even if
it is more than nominal, so long as it is "'reasonably related to
the expenses incident to the administration of the ordinance.'"
Id. at 1110 (quoting Stonewall Union v. City of Columbus,
931 F.2d 1130, 1136 (6th Cir. 1991)).

At the trial, Timothy P. Underwood, county attorney for Giles
County, testified that for his services he bills the county at $150
per hour. He attends and advises the board at its meetings. He
also testified that it costs the county clerk's office $25 per
application for the maintenance of files and the actual issuance of
a permit. Other costs include fingerprinting, court costs
associated with denials, and court reporter costs. It costs $48 to
run a state background check on an applicant through the Tennessee
Bureau of Investigation. There are additional costs associated

56

with running a national background check on an applicant through the Federal Bureau of Investigation. Further costs would include ongoing investigations into the compliance with the Registration Act and court costs and attorney fees in cases of revocation.

Although the Court has found several of the provisions of the Registration Act to be invalid, it finds that the fee requirements "as a whole [are] as minimal as necessary to meet the costs of the [government entity]" in administering and enforcing the Act. See Broadway Books, Inc. v. Roberts, 642 F. Supp. 486, 493 (E.D. Tenn. 1986) (finding that the $500 license fee of the Chattanooga City Ordinance was constitutionally valid); Deja Vu of Nashville, 274 F.3d at 395-96 (finding $100 permit fee reasonably related to expenses incident to administration of ordinance). Accordingly, the plaintiff's claim of excessive fee requirements fails.

## C. VAGUENESS AND OVERBREADTH

Under the due process requirement of the Fourteenth Amendment to the United States Constitution, laws must clearly define the conduct they proscribe. Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222, 227 (1972). The vagueness of laws that attempt to regulate speech raises "special concerns under the Federal Constitution's First Amendment because of the obvious chilling effect of such regulations on free speech." Reno v. ACLU, 521 U.S. 844, 845, 117 S.Ct. 2329, 2332, 138 L.Ed.2d 874, 876 (1997). Such laws must "give the person of ordinary

57

intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Grayned, 408 U.S. at 108, 92 S.Ct. at 2298, 33 L.Ed.2d at 227. This requirement was explained as follows:

> [v]ague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant danger of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked."

Id. (footnotes omitted).

In determining whether an ordinance is impermissibly vague, the Court "'must extrapolate its allowable meaning'" while keeping in mind that "it is not within [the Court's] power to construe and narrow state laws." Id., 408 U.S. at 110, 92 S.Ct. at 2300, 33 L.Ed.2d at 228 (quoting Garner v. Louisiana, 368 U.S. 157, 174, 82 S.Ct. 248, 257, 7 L.Ed.2d 219 (1961)). In doing so, the Court is "'relegated . . . to the words of the ordinance itself,' to the interpretations [other courts] have given to analogous statutes, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." Id. (quoting Coates v. Cincinnati, 402 U.S. 611, 614 n.11, 91 S.Ct. 1686, 1688 n.11, 29 L.E.2d 214, 217 n.11 (1971)) (footnotes omitted).

58

A law will be considered impermissibly vague if it "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Const. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed.2d 322, 328 (1926). However, if the meaning of the law is commonly understood, it will not be considered vague. See United States v. J.T. Haun, 90 F.3d 1096, 1101 (6th Cir. 1996). Additionally, the prohibited conduct need not be defined with mathematical precision. Columbia Natural Res. Inc. v. Tatum, 58 F.3d 1101, 1108 (6th Cir. 1995). Nor is a law vague because it "'requires a person to conform his conduct to an imprecise but comprehensible normative standard.'" Id. (quoting United States v. Angiulo, 897 F.2d 1169, 1179 (1st Cir.), cert. denied, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990)).

In addition, laws which are overbroad, threatening the exercise of First Amendment rights, are unconstitutional. Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Recognizing that the application of the overbreadth doctrine is "'strong medicine,'" the Supreme Court has "employed it with hesitation and then 'only as a last resort.'" New York v. Ferber, 458 U.S. 747, 769, 192 S.Ct. 3348, 3361, 73 L.Ed.2d 1113, 1130 (1982)(quoting Broadrick, 413 U.S. at 613, 93 S.Ct. at 2916, 37 L.Ed.2d at 840).

59

Moreover, the overbreadth must be substantial when the protected expression involves conduct and not speech only. Id., 458 U.S. at 770, 102 S.Ct. at 3361, 73 L.Ed.2d at 1131 (citing Broadrick, 413 U.S. at 615, 93 S.Ct. at 2918, 37 L.Ed.2d at 842). Accordingly, a regulation should not be invalidated for overbreadth if it marginally infringes on First Amendment freedoms. Id., 458 U.S. at 770 n.25, 192 S.Ct. at 3362 n.25, 73 L.Ed.2d at 1131 n.25. A law is substantially overbroad if it "reaches a substantial number of impermissible applications," Ferber, 458 U.S. at 771, 102 S.Ct. at 3362, 73 L.Ed.2d at 1132, "judged in relation to the statute's plainly legitimate sweep." Broadrick, 413 U.S. at 615, 93 S.Ct. at 2918, 37 L.Ed.2d at 842. Additionally, laws are unconstitutional if they impose restrictions so broad they cause concern over violating the law, thereby creating a "chilling effect" that curtails the availability of non-obscene expression. Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); see also Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1962).

A facial challenge can be raised on behalf of others under an exception to the ordinary standing requirements on the basis that a law is substantially overbroad. Regan v. Time, 468 U.S. 641, 650, 104 S.Ct. 3262, 3268, 82 L.Ed.2d 487, 496 (1984). To prevail on such an attack, the plaintiff must establish that there is "'a realistic danger that the statute itself will significantly

60

compromise recognized First Amendment protections of parties not before the Court.'" New York State Club Assn. v. New York City, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1, 15 (1988) (quoting City Council v. Taxpayers for Vincent, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772, 784 (1984)).

Due to concerns of federalism that arise when a federal court reviews the constitutionality of a state regulation that is challenged as unconstitutionally vague or overbroad, the reviewing court may not supply a limiting construction in order to save the regulation from being unconstitutional. Triplett Grille, 40 F.3d at 136 (citing Eubanks v. Wilkinson, 937 F.2d 1118, 1122 (6th Cir. 1991) for the proposition that "federal 'courts do not rewrite statutes to create constitutionality.'").

### 1. standing

The defendants contend that Ms. Belew lacks standing to assert vagueness or overbreadth claims to various definitions in the Act. In American Mini Theatres, the Supreme Court stated:

> Because the ordinances affect communication protected by the First Amendment, respondents argue that they may raise the vagueness issue even though there is no uncertainty about the impact of the ordinances on their own rights. On several occasions we have determined that a defendant whose own speech was unprotected had standing to challenge the constitutionality of a statute which purported to prohibit protected speech, or even speech arguably protected. This exception from traditional rules of standing to raise constitutional issues has reflected the Court's judgment that the very existence of some statutes may cause persons not before the Court to refrain from engaging in constitutionally protected speech or expression. See Broadrick v. Oklahoma,

61

413 U.S. 601, 611-614, 93 S.Ct. 2908, 2915-2917, 37 L.Ed.2d 830. The exception is justified by the overriding importance of maintaining a free and open market for the interchange of ideas. Nevertheless, if the statute's deterrent effect on legitimate expression is not "both real and substantial," and if the statute is "readily subject to a narrowing construction by the state courts," see Erznoznik v. City of Jacksonville, 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975), the litigant is not permitted to assert the rights of third parties.

427 U.S. at 59-60, 96 S.Ct. at 2447, 49 L.Ed.2d at 319-20 (footnote omitted). The Court found that the plaintiffs had standing, although it rejected their vagueness claim. Likewise, in Richland Bookmart, 137 F.3d at 441, the Sixth Circuit apparently determined that the plaintiff had standing to assert its claim of vagueness, although it found that the plaintiff was clearly an "adult-oriented establishment" and "[a]ny element of vagueness in the act [did] not affect [the] plaintiff." The Court went on to conclude that the challenged section was not unconstitutionally vague.

In Triplett Grille, the Sixth Circuit addressed the standing of a plaintiff who was asserting an overbreadth claim. The Court stated:

As this Court has recognized, the "overbreadth doctrine constitutes an exception to traditional rules of standing and is applicable only in First Amendment cases in order to ensure that an overbroad statute does not act to 'chill' the exercise of rights guaranteed protection." Leonardson v. City of East Lansing, 896 F.2d 190, 195 (6th Cir. 1990) (quoting NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963)). Under the doctrine, "an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it also threatens others not before the court--those who desire to engage in legally protected

62

expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.'" <u>Board of Airport Comm'rs v. Jews for Jesus, Inc.</u>, 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987) (quoting <u>Brockett v. Spokane Arcades, Inc.</u>, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985)). While the overbreadth doctrine is "strong medicine" that is used "sparingly and only as a last resort," <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973), a plaintiff may prevail on a facial attack by demonstrating there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." <u>City Council of Los Angeles v. Taxpayers for Vincent</u>, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984).

<u>Triplett Grille</u>, 40 F.3d at 135.

Because several sections of the Registration Act have been determined to be constitutionally infirm, the Court finds that the plaintiff, Ms. Belew, has standing to assert the following vagueness or overbreadth claims.

### 2. definitions

### a. adult entertainment[24]

The plaintiff contends that in defining, "adult entertainment," the Registration Act does not define the phrases,

_____

[24]Adult entertainment is defined as:

any exhibition of any adult-oriented motion picture, live performance, display or dance of any type, which has as a significant or substantial portion of such performance, any actual or simulated performance of specified sexual activities of exhibition and viewing of specified anatomical areas, removal of articles of clothing or appearing unclothed, pantomime, modeling, or any other personal service offered customers . . . .

Tenn. Code Ann. § 7-51-1102(3).

"adult-oriented motion picture, live performance, display or dance," "a significant or substantial portion of such performance" and "any other personal service offered customers." She asserts that a person of ordinary intelligence would necessarily have to guess at the meaning and differ as to the application of such phrases. She contends that the definition of "adult entertainment" covers a much broader spectrum than exhibitions which are traditionally said to give rise to deleterious secondary effects such as "XXX" rated movies. She argues that a single scene or a few scenes of simulated sexual contact within a movie can be considerably "significant" in terms of the storyline and therefore the Act regulates a far broader spectrum of First Amendment protected material than the type which is customarily subject to governmental regulatory measures.

The Court finds that the definition is neither vague nor overbroad. In Richland Bookmart, the Sixth Circuit found that the challenged definitions in the Tennessee Adult-Oriented Establishment Act, Tenn. Code Ann. § 1401 et seq. (1995), were sufficiently defined that a reasonable person would understand them. 137 F.3d at 441. With regard to the definition of "adult-oriented establishment," the Court stated:

> [T]he law is not as vague as the bookstore contends. To be included within the purview of the act, an establishment must (1) have as its "principal or predominant stock or trade" sexually-oriented materials, devices or paraphernalia and (2) restrict admission to adults only. The terms used in the act are

understandable common terms. Most buyers, sellers and judges know what such materials are and who are adults and who are children.

The Supreme Court examined overbreadth in detail in New York v. Ferber, 458 U.S. 747, 773-74, 102 S.Ct. 3348, 3363-64, 73 L.Ed.2d 1113 (1982). In Ferber, the Court refused to find as unconstitutionally overbroad a state statute prohibiting persons from knowingly promoting sex by children under 16 by selling such material. The Court held that the mere possibility that some protected expression, some erotic literature, could arguably be subject to the statute was insufficient reason to find it unconstitutionally overbroad. The Court said that we should not assume that state courts would broaden the reach of a statute by giving it an "expansive construction." This is consistent with Tennessee law that provides that such regulation of speech should be construed narrowly. Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 526 (Tenn. 1993).

Id. (emphasis added).

In applying Richland Bookmart to this case, the Court finds the phrase, "adult-oriented motion picture, live performance, display or dance," is one that is commonly understood. Also, unlike in Deja Vu of Nashville where the Court found the definition of "sexually oriented" to be unconstitutionally overbroad where it was defined, in part, as "any exhibition of any motion pictures . . . depicting 'specified sexual activities' or specified anatomical areas,'" 274 F.3d at 387-88 (emphasis supplied), the definition of "adult entertainment" specifically limits the phrase to those performances which have "as a significant or substantial portion of such performance[s], any actual or simulated performance of specified sexual activities of exhibition and viewing of specified anatomical areas . . . ." This narrow application to such material

is further evidenced by reading in context other definitions in the Registration Act such as "adult motion picture theater," Tenn. Code Ann. § 7-51-1102(5), which is defined as a building that regularly presents material that has as a <u>dominant theme or is distinguished or characterized</u> "by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas as defined [in the Registration Act]."

As the Court in <u>Richland Bookmart</u> found the phrase, "principal or predominate stock or trade," to be one that a reasonable person would understand, this Court finds that the phrase, "significant or substantial portion of such performance," is substantially similar and is therefore one that a reasonable person would understand. Such limiting language clearly differentiates between a "PG-13" or "R" rated movie which shows a scene of simulated sexual contact and the type which is characterized by an emphasis on sex acts or specific body parts. <u>Deja Vu of Nashville</u>, 274 F.3d at 388.

Lastly, the Court finds the plaintiff's assertion regarding the phrase "any other personal service offered customers" to be without merit. The phrase read in context of the entire definition clearly pertains and is limited to that entertainment "which has as a significant or substantial portion of such performance, any actual or simulated performance of specified sexual activities of exhibition and viewing of specified anatomical areas."

66

Accordingly, because the Court finds the definition of "adult entertainment" valid, the plaintiff's argument that the use of that phrase in the definition of "adult-oriented establishment" and in connection with the phrase, "adult entertainment studio," within the same definition renders the definition of "adult-oriented establishment" overbroad is without merit.

### b. adult cabaret[25]

The plaintiff contends that in defining "adult cabaret" the Registration Act does not define the phrases, "entertainment of an erotic nature" and "exotic dancers," and that such undefined phrases render the definition unconstitutionally overbroad. An "adult cabaret" is defined as those establishments where as a principal use of their business entertainers expose "the bare female breast below a point immediately above the top of the areola, human genitals, pubic region, or buttocks, even if partially covered by opaque material or completely covered by translucent material; including swim suits, lingerie, or latex covering." Thus, to be considered an adult cabaret, an establishment must first meet these requirements. An example of such establishments, i.e., businesses where entertainers expose "the bare female breast below a point immediately above the top of the areola, human genitals, pubic region, or buttocks," are those

---

[25]"Adult cabaret" is defined in footnote three of this memorandum.

that provide entertainment of an erotic nature, including exotic dancers.

The Court finds that there is nothing overbroad about the definition of "adult cabaret." "Erotic" is a word that is commonly understood. <u>Richland Bookmart</u>, 137 F.3d at 441. <u>Webster's Ninth New Collegiate Dictionary</u> 422 (1985), defines "erotic" as follows: "1. of, devoted to, or tending to arouse sexual love or desire; 2. strongly affected by sexual desire." The phrase, "entertainment of an erotic nature," read in context with the whole definition is one that a reasonable person would understand. Likewise, the phrase, "exotic dancers," read in context with the whole definition is one that a reasonable person would understand. Accordingly, the plaintiff's claim fails.

### c. employee

The Registration Act defines "employee" as follows:

> [A] person who performs any service on the premises of an adult-oriented establishment on a full-time, part-time, or contract basis, whether or not the person is denominated an employee, independent contractor, agent or otherwise, and whether or not such person is paid a salary, wage, or other compensation by the operator of such business. "Employee" does not include a person exclusively on the premises for repair or maintenance of the premises or equipment on the premises, or for the delivery of goods to the premises . . . .

Tenn. Code Ann. § 7-51-1102(9).

The plaintiff contends that this definition is overbroad and includes persons whose services do not relate to unwanted "secondary effects" associated with adult-oriented businesses. She

68

contends that an accountant who, while in the office of a nightclub, performs an audit of the business's books or an attorney who inspects the premises to ensure that the physical layout of the nightclub complies with the Registration Act would qualify as an "employee." The Court finds this contention is without merit.

Unlike the definition at issue in Ellwest Stereo Theater, 718 F. Supp. at 1573, the definition here excludes those who are "exclusively on the premises for repair or maintenance of the premises or equipment on the premises, or for the delivery of goods to the premises." The term is "sufficiently defined so that a reasonable person would understand" it. Richland Bookmart, 137 F.3d at 441. Moreover, such an interpretation as asserted by the plaintiffs would produce absurd results which "are to be avoided if alternative interpretations consistent with the legislative purpose are available." Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 576, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973, 983 (1982); Smith v. Babcock, 19 F.3d 257, 263 (6th Cir. 1994). Accordingly, this claim fails.

### d. entertainer

The Registration Act defines "entertainer" as:

> "Entertainer" means any person who provides entertainment within an "adult-oriented establishment" as defined in this section, whether or not a fee is charged or accepted for entertainment and whether or not entertainment is provided as an employee, escort or an independent contractor . . . .

Tenn. Code Ann. § 7-51-1102(10).

69

The plaintiff contends that the Act does not define "entertainment," although it does define "adult entertainment" in Tenn. Code Ann. § 7-51-1102(3), and that the legislature may have intended "entertainment" to include a broader range of conduct.

The Court disagrees. The word "entertainment" is used in reference to "adult-oriented establishment." The definition of "adult-oriented establishment" includes establishments which are defined by the Registration Act as presenting material that primarily focuses on specified sexual activities or entertainment of an erotic or sexual nature. It also includes the word "entertainer" as one who provides "adult entertainment to a member of the public, a patron or a member, when such adult entertainment is held, conducted, operated or maintained for a profit, direct or indirect." Tenn. Code Ann. § 7-51-1102(6).

The Court finds that the definition of "entertainer," taken in context with the definition of "adult-oriented establishment," is sufficiently defined so that a reasonable person would understand the term. Accordingly, the plaintiff's assertion fails.

VI.

The Registration Act was amended, although not codified, to include a severability clause. It reads:

> If any provision of this act or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to that end the provisions of this act are declared to be severable.

70

2001 Tenn. Pub. Acts 183, section 16. Also, Tenn. Code Ann. § 1-3-110 provides a general severability clause, which states:

> It is hereby declared that the sections, clauses, sentences and parts of the Tennessee Code are severable, are not matters of mutual essential inducement, and any of them shall be exscinded if the code would otherwise be unconstitutional or ineffective. If any one (1) or more sections, clauses, sentences or parts shall for any reason be questioned in any court, and shall be adjudged unconstitutional or invalid, such judgment shall not affect, impair or invalidate the remaining provisions thereof, but shall be confined in its operation to the specific provision or provisions so held unconstitutional or invalid, and the inapplicability or invalidity of any section, clause, sentence or part in any one (1) or more instances shall not be taken to affect or prejudice in any way its applicability or validity in any other instance.

Id.

"It is the duty of the courts to give effect to a severability clause and to make an elision, so as not to invalidate an entire act." Brown v. Alexander, 718 F.2d 1417, 1428 (6th Cir. 1980)(citing Moore v. Fowinkle, 512 F.2d 629 (6th Cir. 1975)). When legislation contains a severability clause, it is the duty of the court to "make an elision, so as not to invalidate an entire act" "unless observance thereof would frustrate the dominant legislative intent." Moore, 512 F.2d at 632 (citations omitted). Moreover, if severing the unconstitutional provisions of an act would cause it to be essentially meaningless, the Court should not give effect to the severability clause. Ellwest, 718 F. Supp. at 1581.

As set forth above, the Court finds that several provisions of the Adult-Oriented Establishment Registration Act are

71

unconstitutional as violations of the First Amendment to the United States Constitution. However, the Court finds that the offending provisions may be severed from the Registration Act without frustrating the dominant intent of the Act. Therefore, the Court will grant injunctive relief no broader than necessary to remedy the harm at issue. See Kallstrom, 136 F.3d at 1069.

VII.

In summary, the Court finds that Kathryn Theresa Piper lacks standing to challenge the Adult-Oriented Establishment Registration Act and her claims are dismissed. The Court finds that § 7-51-1104(e) is invalid insofar that it does not provide the status quo to be maintained for existing entertainers pending final judicial review. For the same reason, the Court finds § 7-51-1110(b) to be invalid because it does not provide the status quo to be maintained pending final judicial review for applicants seeking permit renewals. The Court further finds that § 7-51-1113(a) is invalid because it allows the board unfettered discretion to require from an applicant "such other information as may be required" by it. As a result, the Court finds § 7-51-1113(b) to be invalid to the extent that the register includes "such other information as may be required by the board." Lastly, the Court finds § 7-51-1113(j) is invalid to the extent that it requires an entertainer to produce protected private information to a customer.

72

Based upon the Court's findings and conclusions regarding the invalidity of the aforementioned provisions of the Registration Act, injunctive relief shall be granted. The plaintiffs have succeeded on the merits and shown infringement upon First Amendment values, constituting irreparable injury sufficient to justify injunctive relief. Connection Distrib., 154 F.3d at 288. There is no other adequate remedy at law to prevent further injury except for injunctive relief. Moreover, in considering other equitable factors, the Court finds that there is no apparent substantial harm to others and granting injunctive relief serves the public interest through the vindication of rights protected by the First Amendment.

Accordingly, the defendants shall be enjoined from enforcing §§ 7-51-1104(e) and 7-51-1110(b) of the Adult-Oriented Establishment Registration Act unless the status quo is maintained pending final judicial review. The defendants shall also be enjoined from enforcement of § 7-51-1113(a), (b) to the extent that it allows the board to request "such other information as may be required by the board" and to the extent that the register includes "such other information as may be required by the board." The Court further finds, pursuant to Deja Vu of Nashville, 274 F.3d at 395, that to the extent that identifying information, such as an entertainer's name, is included on an entertainer's permit, § 7-51-1113(j) cannot require an "entertainer" to show such private

73

information on his or her permit to a "customer" upon that customer's request.

An appropriate order shall be entered.

_____
Thomas A. Higgins
United States District Court
9-29-05

Case 1:01-cv-00139 Document 20 Filed 09/30/05 Page 74 of 74 PageID #: 74